*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
April 25, 2024

v

No. 361665
Van Buren Circuit Court
LC No. 2021-023040-FC

GREGORY ALLEN STRATTON,

Defendant-Appellant.

Before: M. J. KELLY, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant-Appellant, Gregory Stratton, appeals by right his jury conviction of criminal sexual conduct in the first degree (CSC-I) for engaging in sexual penetration of a person under 13 years of age. See MCL 750.520b(1)(a). Because we conclude that Stratton has not identified any errors that warrant a new trial, we affirm.

## I. BASIC FACTS

This case originated in October 2019, which was when the victim, AK, reported that Stratton had sexually assaulted her at knife-point in her home. AK was 17 years old at the time and had known Stratton through her family for years. Stratton was approximately 17 years older than AK. Stratton admitted to the police that he had had sexual intercourse with AK, but he stated it was consensual. Eventually Stratton agreed to take a polygraph examination.

The examination occurred in January 2020. The detective who administered the examination informed Stratton that he had failed the examination and then began to question him about certain details. Stratton volunteered that he had first had sexual intercourse with AK at an outhouse located next to Van Auken Lake in 2012 or 2013. He explained that he, AK, and another minor, SB, had planned to have sexual relations at the lake, but SB backed out. Stratton told the detective that he just had sex with AK.

Thereafter, the detective interviewed AK, who provided statements that appeared to confirm that Stratton had sexual intercourse with her at Van Auken Lake when she was under 13

-1-

years of age. She also disclosed other incidents of sexual abuse. On the basis of these revelations along with the original complaint, the prosecutor charged Stratton with four counts of CSC-I.

At trial, AK testified that Stratton forcibly sexually assaulted her in the outhouse while SB was present. She did not recall how old she was at the time, but she testified that she became pregnant by someone else when she was 14 years of age and was sent away for some time. She stated that the incident at the outhouse occurred a few years before she became pregnant. AK denied that Stratton had sexual intercourse with her on any other occasion. She described two incidents, however, in which she stated that Stratton attempted to have sexual intercourse with her against her will, but she escaped. After AK's testimony, the prosecutor moved to amend the information to include one count of CSC-I involving sexual penetration of a person under 13 years of age and two counts of assault with the intent to commit criminal sexual conduct involving sexual penetration. The trial court granted the motion.

The jury heard a redacted version of Stratton's statement in which he described having consensual sexual intercourse with AK at her home when she was 17 years of age and at the outhouse when she would have had to have been 11 or 12 years of age. The jury heard him recount to the detective that SB was present and that he had originally planned to have sexual relations with her too. After the prosecution rested, Stratton testified on his own behalf and denied that he had ever had sex with AK. SB also testified and she denied that she had ever been to Van Auken Lake with AK and Stratton.

The jury found Stratton guilty of CSC-I involving a child under 13 years of age and found him not guilty on the two counts of assault with the intent to commit criminal sexual conduct involving penetration.

## II. ADJOURNMENT

### A. STANDARD OF REVIEW

Stratton argues in part that the trial court's refusal to adjourn his trial after he retained his fourth lawyer, Daniel Grow, deprived him of his right to have his counsel of choice. This Court reviews a trial court's decision on a motion to adjourn for an abuse of discretion. *People v Williams*, 386 Mich 565, 571-572; 194 NW2d 337 (1972). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015). Questions of constitutional law are reviewed de novo. *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012).

### B. ANALYSIS

Stratton had a constitutionally guaranteed right to retain the counsel whom he believed to be the best for his defense. See *United States v Gonzalez-Lopez*, 548 US 140, 144 146; 126 S Ct 2557; 165 L Ed 2d 409 (2006). When a trial court wrongfully refuses to allow the defendant's counsel of choice to represent him or her at trial, the error is complete and the defendant need not demonstrate prejudice. *Id*. at 147-148.

Stratton hired Grow while his third lawyer, Kurt Richardson, was still representing him. In March 2022, Richardson and Grow appeared at the hearing, and Grow informed the trial court that he would be representing Stratton. When asked whether he would need to adjourn the trial's start date, Grow stated that he needed "a little bit more time" to address pretrial issues. The trial court agreed to allow the change in lawyers but stated that it would not grant an adjournment. Grow said that he understood and that he still wanted the court to sign the order of substitution. Grow filed several motions, including a motion to adjourn trial. The court denied the motions.

The record shows that the court allowed Stratton to hire the lawyer of his choice—at least on his implied representation that he would be able to proceed on the scheduled trial date, which was then three weeks away. Stratton, however, argues that the court's decision to deny Grow's request to adjourn the trial should be treated as a denial of his counsel of choice because that decision prevented Grow from defending him in the way that he would have liked. However, it is not clear that requiring Grow to proceed to trial with only three weeks of preparation constitutes the deprivation of counsel of choice. Indeed, the United States Supreme Court explained that, unlike the case with ineffective assistance, the harm caused by the deprivation of counsel of choice defied harmless-error review:

> To determine the effect of wrongful denial of choice of counsel, however, we would not be looking for mistakes committed by the actual counsel, but for differences in the defense that would have been made by the rejected counsel—in matters ranging from questions asked on *voir dire* and cross-examination to such intangibles as argument style and relationship with the prosecutors. We would have to speculate upon what matters the rejected counsel would have handled differently—or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors. And then we would have to speculate upon what effect those different choices or different intangibles might have had. The difficulties of conducting the two assessments of prejudice are not remotely comparable. [*Gonzalez-Lopez*, 548 US at 151.]

The difficulties identified by the Supreme Court are not present here. Grow represented Stratton in the motions before trial and at trial. We know how he acted and can review whether he might have performed better had the trial court granted him more time to prepare. Accordingly, this is not a case in which the trial court's decision clearly implicated Stratton's right to retain counsel of choice.

Moreover, even if it did implicate that right, the trial court still had the discretion to refuse to adjourn the trial. A trial court has the discretion to refuse to adjourn trial to provide a defendant with the opportunity to secure counsel of choice. See *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003). Similarly, the United States Supreme Court has recognized that trial courts have broad authority to schedule trials and has held that a trial court does not invariably deprive a defendant of his right to counsel by refusing to adjourn. See *Morris v Slappy*, 461 US 1, 11-12; 103 S Ct 1610; 75 L Ed 2d 610 (1983). A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 US at 152 (quotation marks and citations omitted.) Accordingly, it is within a trial

court's discretion to refuse to adjourn a trial—even when necessary to accommodate a defendant's retention of his or her counsel of choice.

When reviewing the trial court's decision whether to adjourn to accommodate counsel's needs, this Court considers several factors:

> (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision. [*Akins*, 259 Mich App at 557 (quotation marks and citation omitted).]

In considering this issue, the trial court went over the procedural history of this case and noted that Stratton had hired counsel of his own choosing three times: he replaced appointed counsel in May 2021; he replaced the lawyer who negotiated his plea deal in September 2021 (which was just one week before the then-scheduled start of trial); and he hired Grow just weeks before his latest start date. The court added that Stratton's third lawyer, Richardson, was granted an adjournment of the trial to prepare. Thereafter, the court had to make a second adjournment to accommodate its docket involving a backlog of cases caused by the COVID pandemic. The court noted that Stratton had twice elected to switch lawyers at or after the final pretrial conference. The court found Stratton's decision to replace his first two lawyers of choice on such short notice was the result of his own negligence in ensuring that the lawyers whom he hired were the ones whom he "wished to represent him at trial."

The court acknowledged that Stratton's constitutional rights were implicated by its decision whether to adjourn. It did not, however, agree that the failure to adjourn would prevent Stratton from having a fair trial. Stratton's retained lawyers had 10 months to prepare for trial, and all the motions that Grow filed at the last minute could have been filed by previous lawyers during those months. The court stated that it had not strictly adhered to the scheduling order and had in fact allowed Richardson to move to suppress Stratton's confession that required an evidentiary hearing. The court also noted that Grow had impliedly assured the court that he could proceed when the court allowed his late substitution for Stratton's previous counsel of choice.

The trial court refused to accept Grow's assertion that Stratton's two previously retained lawyers were ineffective. The court stated that it had no basis by which to evaluate their decisions and that it was just as likely that Stratton's previous lawyers simply disagreed with Grow's trial strategy. The court concluded that Stratton's previous lawyers must have determined that the additional issues raised by Grow were not meritorious. Moreover, the trial court specifically addressed the grounds for adjournment that Grow asserted and found that they lacked merit.

The trial court stated that, although Grow complained that he did not have a transcript from the hearing to suppress, he did have an electronic copy of the hearing. The court did not put much weight behind Grow's assertion that he needed time to hire experts—who had not yet been retained—on polygraphs and confessions. The court noted that Grow wanted time to find "unidentified critical witnesses," "unidentified rebuttal evidence," and to review interviews with

"unidentified persons," but failed to support those claims in his motions. Rather, he relied on the assertion that previous lawyers failed to undertake critical trial preparation. The court rejected the contention that it had to adjourn trial on the basis of "unsubstantiated allegations of ineffective assistance."

The trial court concluded that, after carefully weighing the factors, it would not further delay the start of trial. Rather, because Stratton had not shown that the "request for an adjournment to accommodate additional trial preparation" was meritorious, the trial court denied the request.

Based upon the record, it is plain that the trial court carefully considered all the relevant factors when evaluating Stratton's request for an adjournment and reasonably concluded that Stratton had not established grounds to adjourn the case. Despite the trial court's thorough analysis, Stratton maintains that the trial court erred in several respects when it denied his motion to adjourn. Stratton repeatedly asserts that the trial court deprived him of his counsel of choice—Grow—who, he claimed, was the first lawyer who would zealously fight for him. Stratton had, however, been able to secure two previous lawyers, and he presumably investigated those lawyers and felt at that time that they too were going to zealously fight for him. Notably, Stratton was out on bond before trial and had every opportunity to interact with his chosen lawyers, evaluate their styles, and inform them of his personal expectations. Richardson even moved to suppress Stratton's confession on Stratton's assertion that he was drunk, high, and sleep deprived at the time that he agreed to waive his rights despite overwhelming evidence to the contrary. Richardson zealously advocated for Stratton at that hearing. Given this record, the trial court did not err when it concluded that Stratton was in part negligent when he repeatedly changed lawyers at the last moment.

Stratton makes much of the fact that Grow filed numerous motions that previous lawyers had not filed. Grow's motions, however, were heavy on law and light on facts and analysis. Grow also did not make the requisite showings to support the motions. For these reasons, the trial court determined that the motions lacked merit and did not establish grounds for an adjournment.

The record fully supports that conclusion. For example, Grow failed to identify any ground that would warrant setting aside Stratton's decision to waive his preliminary examination. See *People v Taylor*, 316 Mich App 52, 55-56; 890 NW2d 891 (2016) (listing the circumstances under which a circuit court may remand a case for a preliminary examination). Instead, he speculated that the preliminary examination was necessary because it might have revealed some evidence or resulted in the dismissal of the charges. Grow's speculation and his desire for discovery did not establish grounds for a remand. Accordingly, as the trial court correctly determined, Grow's motion to remand was meritless.

Stratton also faults the trial court for allegedly elevating its docket over his constitutional rights. Scheduling matters are a proper consideration when evaluating whether to adjourn, even though the decision implicates constitutional rights. See *Gonzalez-Lopez*, 548 US at 152. Stratton suggests that the trial court could easily have adjourned trial again because it did so to accommodate its own congested docket after the first adjournment. The fact that the trial court's docket was congested was a factor in favor of denying the adjournment. The trial court had already granted one adjournment to accommodate Stratton's last-minute desire to change from one lawyer to another. That adjournment likely raised additional scheduling conflicts in the court's already

congested docket. For that reason, the trial court could reasonably consider both adjournments along with Stratton's history of last-minute changes in lawyers when evaluating whether a third adjournment was necessary to protect Stratton's rights.

On this record, the trial court's decision to deny Stratton's motion to adjourn trial fell within the range of principled outcomes. See *McFall*, 309 Mich App at 382. Accordingly, it did not abuse its discretion, and the decision did not deprive Stratton of his counsel of choice. See *Akins*, 259 Mich App at 559-560.

## III. INEFFECTIVE ASSISTANCE

### A. STANDARD OF REVIEW

Stratton next argues that his lawyers provided ineffective assistance that warrants a new trial. This Court reviews de novo whether a defense lawyer's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018). Because Stratton was unable to expand the record, this issue is reviewed for errors apparent on the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

### B. ANALYSIS

Stratton argues that—even if the trial court did not abuse its discretion when it denied his motion to adjourn—Richardson provided ineffective assistance by failing to make the same motions that Grow made. To establish ineffective assistance, Stratton must show that Richardson's failure to file the motions fell below an objective standard of reasonableness under prevailing professional norms and that, but for his deficient performance, there is a reasonable probability that the outcome would have been different. See *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021).

Stratton appears to argue that Richardson's failure to file the motions fell below an objective standard of reasonableness because Grow filed them. Grow's decision to file the motions does not establish that Richardson's failure to file them fell below an objective standard of reasonableness under prevailing professional norms. This Court strongly presumes that a defense lawyer provided effective assistance. *Id.* "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *Id.* at 429-430.

Here, a legitimate strategic reason for Richardson's failure to file motions similar to those filed by Grow exists: the motions lacked merit. Stratton has proceeded with his appeal on the assumption that the motions had merit. The trial court, however, determined that none had merit. As already discussed, Grow's motion for a remand for a preliminary examination was meritless given that he did not even identify a basis for remanding. The trial court also did not abuse its discretion when it denied Grow's motion to adjourn and Richardson already sought and obtained a motion to adjourn. Finally, even a cursory review of the motions demonstrated that they too were meritless as filed.

Grow moved for additional discovery in which he asserted that the trial court should order the prosecutor to turn over all the data, algorithms, models, notes, and a description of the equipment used in the polygraph examination. He also asked for discovery about the detective's training in polygraph examinations. The requested discovery could only be useful to impeach the detective's handling of the polygraph test and results, but those results were not admissible at trial. Indeed, it is error to even mention that the defendant took a polygraph test. *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000). For that reason, it is unclear why the defense would need that information. Grow also mentioned that he wanted unredacted copies of discovery, but he did not identify any redacted discovery in his possession and did not state how the redactions affected his ability to defend Stratton. He implied that the redactions somehow related to the polygraph, but he did not clarify the matter in his brief. As written, Grow's motion did not establish grounds for continuing discovery at the expense of proceeding to trial. See MCR 2.503(C) (discussing when a trial court may adjourn trial on the basis of missing evidence or witnesses).

Grow also filed a motion seeking discovery; he argued that he should be provided with all reports and interviews involving AK's previous allegations of sexual abuse. He claimed the right to use those reports to establish that AK had made previous false allegations of sexual abuse. The court treated this as a "Rape Shield Motion" and noted that Grow made no offer of proof showing that the proposed evidence would be admissible to impeach AK. The trial court was correct; Stratton did not make an offer of proof that would have justified allowing the impeachment evidence. See *People v Williams*, 191 Mich App 269, 273; 477 NW2d 877 (1991). There was also no basis for concluding that the discovery was not available to Stratton and warranted an adjournment. See MCR 2.503(C).

Richardson had no obligation to file meritless motions. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003). Moreover, because the trial court actually addressed each of the motions and denied them on the merits, Stratton cannot show that, but for Richardson's failure to file the same motions, the outcome would have been different. See *Haynes*, 338 Mich App at 429.[1] Accordingly, Stratton has not shown that Richardson provided ineffective assistance by failing to file motions similar to the ones that Grow filed and which the trial court determined lacked merit.

Stratton also argues that Grow provided ineffective assistance by filing these motions without noticing them for a hearing. Assuming that the failure to properly notice the motions for a hearing fell below an objective standard under prevailing professional norms, Stratton has not shown that the failure to file notice prejudiced him. The trial court denied the motions as untimely and because they lacked merit. Consequently, Stratton has not shown that, but for the error, the

---

[1] Stratton suggests that his claims of ineffective assistance involving Richardson amounted to structural error because it deprived him of his counsel of choice. Richardson was, however, his counsel of choice at that time, and a claim of ineffective assistance includes a harmless-error analysis except in the most extreme cases, such as when defense counsel has completely failed to serve as the government's adversary. See *United States v Cronic*, 466 US 648, 666-667 & n 41; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

trial court would have granted the motions, let alone that there is a reasonable probability that the outcome of his trial would have been different. See *id.*

Stratton next argues that Grow should have impeached AK with the inconsistencies between her trial testimony and her statements made to the detective. Whether and how to impeach a complainant is a matter of trial strategy that this Court does not second-guess with the benefit of hindsight. See *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). Accordingly, if this Court can conceive of a legitimate strategic reason for Grow's decision to cross-examine AK in the manner that he did, then this Court cannot conclude that the decision fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429-430.

The prosecutor expected AK to testify that Stratton forced her to have sexual intercourse on four separate occasions over a span of years. AK, however, testified that Stratton only forced her to have sex one time in the outhouse at Van Auken Lake. She spoke about an incident in Stratton's car, in a camper, and in her bedroom, but she denied that Stratton successfully engaged in sexual penetration during those incidents. Accordingly, even before Grow had the opportunity to cross-examine AK, the nature of the case had changed dramatically in the defense's favor. For that reason, Grow had to carefully craft his cross-examination and impeachment so as not to elicit testimony on cross-examination or invite the introduction of rebuttal evidence that might substantiate the charges that AK's testimony undermined.

Grow questioned AK about the incidents other than the incident at the lake outhouse so as to bring home the fact that Stratton did not sexually penetrate AK on those occasions. He also carefully examined AK about the outhouse incident so as to bring out issues that might affect her credibility about that incident without bringing in new details. He got her to admit that she did not know how old she was or what year that incident occurred. He also elicited testimony that she did not know how she got there or got home. He also asked AK about drugs and alcohol, and AK stated that none were involved. Grow established that AK had very little memory of that day. Grow also established that SB was the only other witness.

Grow also cross-examined AK about her statements to the detective involving the outhouse incident. She did not remember telling the detective that the only thing she recalled from that incident was that Stratton tried to kiss her. AK recalled telling the detective that she could barely stand, but she did not remember telling him that she was drunk and high. She also did not recall whether she told the detective whether she felt Stratton's penis inside her. She did not recall whose idea it was to go inside the outhouse. Grow also got AK to admit that she had memory problems as a result of head injuries.

On this record, Grow's decision to ask AK about her statements to the detective rather than directly impeaching her with the exact statements cannot be said to have fallen below an objective standard of reasonableness. In her interview with the detective, AK stated that Stratton engaged in sexual penetration with her in each incident other than the outhouse incident. Because AK denied the sexual penetrations at trial, Grow could reasonably conclude that it was not to the defense's advantage to impeach AK by noting that she had previously told the detective that Stratton had sexually penetrated her on those occasions. As a result, it cannot be said that his decision as to those events fell below an objective standard of reasonableness. See *id.*

-8-

AK did tell the detective that she did not recall Stratton sexually penetrating her at the outhouse. Nevertheless, she told the detective about the incident and related details that could have furthered the prosecution's case had they been revealed at trial. AK stated that she was with Stratton and SB at the outhouse near the lake but that she had some memory issues because she was drunk and high. She clarified that Stratton was the reason that she was drunk and high, and she recalled that Stratton was trying to kiss her and touch her in a sexual way. She also recalled that she was really sore after that incident and had red marks all over her legs, and she told the detective that Stratton did not wear a condom during the outhouse incident.

AK stated that SB was there and had wanted to "mess around" with Stratton, but Stratton was only interested in AK. For that reason, she stated, Stratton kept plying her with drugs and alcohol. She told the detective that she then went to the outhouse, and Stratton followed her. She said that after she finished using the bathroom, Stratton came up to her and forcibly began kissing her and touching her while she tried to push him away. Stratton then held her tighter, and SB tried to get Stratton off her. Although AK reiterated that she did not know what happened after that, she told the detective that she was "red and sore" the next day. She stated that she cried the next day after she went to the bathroom and realized what was wrong with her. AK also eventually told the detective that the first time that she had ever had sex with anyone was with Stratton in the outhouse. She also agreed that she was 11 years of age at the time.

The statements that Stratton—who was more than 17 years older than AK—plied an 11- or 12-year-old girl with drugs and alcohol because he wanted to have sexual contact with her were particularly disturbing. Additionally, the statement that Stratton followed her into the outhouse and physically restrained her was consistent with AK's testimony at trial. Finally, even though AK told the detective that she did not specifically recall Stratton sexually penetrating her, she nevertheless related details that would have allowed a reasonable jury to infer that she had been sexually penetrated. Accordingly, if Grow had pursued that line of impeachment more aggressively, the prosecutor might have presented the evidence that AK gave those additional details to provide context and show that her testimony at trial was not in fact inconsistent with her earlier statement. Under these circumstances, Grow could reasonably have concluded that it was better to cross-examine AK about her limited memory of the incident and ask her about some statements that she made, which might have been inconsistent with her trial testimony, rather than risk opening the door to a more thorough recitation of AK's earlier statements. See, e.g., *People v Gioglio*, 296 Mich App 12, 26; 815 NW2d 589 (2012) (stating that defense counsel may legitimately choose not to cross-examine a complaining witness to avoid elaboration on damaging points), vacated not in relevant part and remanded on other grounds 493 Mich 864 (2012). Because we can conceive of a legitimate strategic reason for declining to impeach AK in this way, we cannot conclude that Grow's decision fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429-430.

Stratton also maintains that Grow should have elicited testimony that AK told the detective that she had a multiple personality disorder. AK made that statement as part of a broader discussion in which she explained why she had not revealed the sexual abuse earlier. As Stratton concedes on appeal, there is no record support for the contention that AK has been diagnosed with a mental disorder. Accordingly, that statement had little value and might only have served to suggest how the trauma of sexual abuse affected AK. It was not unreasonable for Grow to choose

-9-

not to elicit that testimony or to impeach AK with that statement but to instead elicit testimony that AK generally had memory problems. See *id*.

Stratton also has not demonstrated that there was a reasonable probability that the outcome would have been different had Grow impeached AK with her statements to the detective. Contrary to Stratton's contention, this case did not involve a true credibility contest. Stratton emphatically told the detective that he had penile-vaginal sexual intercourse with AK for the first time at the outhouse. He described it as consensual and related his belief that AK was about 15 years of age. He only later realized that his math was wrong and that AK must have been 10 or 11 years of age. Stratton's statement to the detective was consistent with AK's testimony at trial, with the exception that AK related that it was not consensual. Consent was not, however, an element of the crime at issue. See MCL 750.520b(1)(a). Therefore, there was overwhelming evidence that Stratton had in fact engaged in sexual penetration of a person who was under 13 years of age. Consequently, even if Grow had impeached AK with her inconsistent statements, and even if the prosecutor had not challenged the impeachment on redirect or through rebuttal evidence, there is no reasonable likelihood that the outcome would have been different, but for the omissions. See *Haynes*, 338 Mich App at 429-430.

Stratton next argues that Grow provided ineffective assistance when he failed to impeach the detective about whether he followed the forensic-interview technique when he questioned AK. Stratton notes that the Legislature has required prosecutors to develop and establish procedures for investigating child abuse and neglect, which includes adopting interview protocols. See MCL 722.628(6). He maintains that the detective tainted the reliability of AK's statements during the interview by his failure to adhere to forensic-interview protocols. It was, however, undisputed that AK's interview was not played for the jury. Thus, there was no need to discuss the detective's interview technique to impeach the credibility of AK's statements in the interview.

Further, the detective testified about statements that AK made to him, but his testimony was brief. He did not provide details beyond that which AK had already discussed in her testimony and the statement by Stratton in his confession. He also admitted that he told AK about Stratton's confession and specifically provided her with details from Stratton's version of events at the outhouse. Therefore, the jury knew that the detective provided information to her that might have influenced her statements. Grow cross-examined the detective at length about his training on interviewing and questioned him in a way that put before the jury whether his technique might have led Stratton to make a false confession. Grow could have elicited testimony about forensic interviewing or presented a witness about forensic interviewing and how it might have helped ensure that AK's statements were reliable and not the result of suggestion, but a reasonable lawyer in Grow's position could also choose not to do so.

Finally, the forensic-interview technique was intended to ensure that statements made by children were not suggested by the interviewer. AK was interviewed just a few months before she turned the age of 18, and it is not clear that she was any more vulnerable to suggestion than a person who was a few months older. Indeed, she repeatedly denied that she had ever performed oral sex on Stratton despite the detective's efforts to get her to agree that she had done so. If Grow had more aggressively impeached the detective about his interview technique, the prosecutor might have tried to rehabilitate the evidence by seeking to introduce the interview or through other evidence.

-10-

In this situation, Grow might have reasonably concluded that it was better to cross-examine the detective and AK about the interview and to argue that AK's recitation of events was not credible, which is precisely what he did. Grow argued to the jury that the evidence showed that AK was trying to start something with Stratton, and, when he was not there for her, she reported the incident in the bedroom after which things got out of her control because the police officers wanted details. Grow maintained that the detective used various interview techniques to get Stratton to confess to things that were not true. Grow identified the inconsistencies in AK's testimony and her poor recollection of events, and then suggested that the common element between AK's statements and Stratton's statements was the detective. He argued that Stratton was confused by the detective and that the detective led him down a path that resulted in a false confession.

Given AK's age at the time of her interview, a reasonable lawyer in Grow's position could choose to limit his or her cross-examination of the detective to establish the point that the detective provided AK with details without getting into the specifics of forensic examination technique. See *Haynes*, 338 Mich App at 429-430. Additionally, for the reasons already discussed, there is no probability that the outcome would have been different if the jury had learned that the detective should have used the forensic interviewing technique with AK. Stratton's own confession was the strongest corroborator of AK's testimony. See *id*.

IV. SUPPRESS CONFESSION

A. STANDARD OF REVIEW

Stratton next argues that his confession was in fact involuntary and Richardson provided ineffective assistance by moving to suppress his confession under the rule stated in *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965), rather than moving to suppress it under *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988). This Court reviews de novo a trial court's decision whether to suppress a confession, but reviews the factual findings underlying its decision for clear error. See *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *Id*.

B. ANALYSIS

The use of an involuntary statement to convict a person violates that person's constitutional rights to due process and against self-incrimination. *Stewart*, 512 Mich at 480, citing in part *Colorado v Connelly*, 479 US 157, 165; 107 S Ct 515; 93 L Ed 2d 473 (1986). Accordingly, if the defendant's free will was overborne or if the defendant's confession was not the product of a rational intellect and free will, the defendant's confession will be treated as coerced and is inadmissible. *Stewart*, 512 Mich at 480, citing *Townsend v Sain*, 372 US 293, 307; 83 S Ct 745; 9 L Ed 2d 770 (1963), overruled in part on other grounds *Keeney v Tamayo-Reyes*, 504 US 1; 112 S Ct 1715; 118 L Ed 2d 318 (1992). Police officers can overcome a defendant's free will through both physical intimidation and psychological pressure. *Stewart*, 512 Mich at 480, citing *Townsend*, 372 US at 307, and *Jackson v Denno*, 378 US 368, 389; 84 S Ct 1774; 12 L Ed 2d 908 (1964). The prosecutor has the burden to demonstrate that the confession was voluntary. *Stewart*, 512 Mich at 480-481.

When determining whether a defendant's statement was coerced by state action, the reviewing court must determine whether the totality of the circumstances involving the making of the confession demonstrates that it was freely and voluntarily made. *Id*. at 481. The reviewing court should consider the factors stated under *Cipriano*, 431 Mich at 334. These factors are:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*.]

The Supreme Court of the United States has endorsed this totality of the circumstances approach after considering various factors to determining whether a confession was voluntary. See *Withrow v Williams*, 507 US 680, 693-694; 113 S Ct 1745; 123 L Ed 2d 407 (1993).

In this case, Richardson first moved to suppress Stratton's confession in January 2022. He argued that Stratton was in custody during his interrogation, did not receive the warnings required under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and did not validly waive his right to remain silent. More specifically, he argued that he was not in a proper state of mind to give consent because he had used alcohol, cocaine, and marijuana the night before and was still under their influence.

The trial court held a hearing on the motion and heard testimony from Stratton and two police officers. The trial court also reviewed the video of the confession. After considering all the evidence, the court found that Stratton was not in custody because a reasonable person would have felt free to end the interrogation at any time and leave. Despite that finding, the trial court found that the detective properly advised Stratton of his rights. The court concluded by considering the *Cipriano* factors. In particular, the court rejected the contention that Stratton was intoxicated or drugged or even sleep deprived; other than Stratton's testimony, the court found that there was "nothing in his demeanor that suggested use of controlled substances other than a couple of yawns, he wasn't sweating, he wasn't distracted, he wasn't jittery, he wasn't sleepy, he wasn't hyper manic, so there's absolutely nothing to support the fact that he was somehow deprived of free will." The court went on to find that the officers treated Stratton with the utmost respect.

When the trial court again reviewed the *Cipriano* factors on Stratton's motion for a new trial, it concluded that Stratton's confession was voluntary. Stratton was 34 years of age at the time of the interview, which was beyond the age at which one might be concerned that a youthful person would have his or her will overborne. He also had had some previous experience with the criminal justice system. Stratton's own statements during the interview showed that he was aware that he was on probation and knew that his statements would be relayed to his probation officer. The court also reiterated its earlier finding that Stratton was not in custody because a reasonable person would have felt at liberty to stop the interview and validly waived his rights after being advised of them. The court again stated that the interview was not excessively long and found that

-12-

no officers abused or threatened Stratton. There were also no signs that Stratton was physically ill, exhausted, or under the influence.

On appeal, Stratton does not argue that the trial court clearly erred in any of its findings from the first suppression hearing, but he again argues that the evidence showed that Stratton did not feel free to leave the interrogation. He asserts that this factor was shown, in part, by the fact that the detective told Stratton that there was no store nearby during the interrogation after Stratton asked to walk to a store. Stratton's claim is not supported by the record. The video showed that Stratton did not ask to leave the building and did not seek to end the interview. Rather, he simply inquired about whether there was a store within walking distance and explained that he needed cigarettes. The detective said no to the question about the existence of a store within walking distance, offered to retrieve a cigarette for Stratton, and briefly left the room. The detective told Stratton that he found a cigarette after a few minutes, but warned that it might be stale. Stratton then left the room and presumably went outside to smoke. Nothing about the episode undermines the court's original finding that Stratton was not in custody. Indeed, the episode supports that conclusion; had Stratton wanted to end the interrogation, that moment would have been the perfect opportunity.

Stratton also refers to the fact that deputies drove him to the Kalamazoo Police Department, which he claims took an hour each way. He further asserts that the detective interviewed him for four hours and states that his only experience with police officers was for driving offenses and possession of marijuana. The record does not support Stratton's assertions. Two police deputies drove Stratton to the police station because Stratton was having car trouble. They had only small talk the whole way there and back, and the trip took only 25 to 30 minutes each way, not one hour. They even stopped for sandwiches on the way back. The interview took about four hours, but that period included over an hour of preliminary questions and short breaks, which included a 15- to 20-minute break to go outside and smoke. Stratton also asserts that he had had no real experience with police officers beyond some minor traffic issues and an arrest for possession of marijuana. Yet Stratton told the detective that he was involved in a police raid at his brother's home and was on probation for a methamphetamine offense.

The totality of the circumstances showed that Stratton's interview was not prolonged and did not include any unnecessary delays. He was carefully advised of his rights and waived those rights. Stratton was also not injured, intoxicated, drugged, or in ill health. Stratton was further not sleep deprived, or deprived of food, or medical attention so as to overwhelm his will. As the court stated, he was also not threatened with abuse or actually abused. Additionally, Stratton had had experience with law enforcement and understood the ramifications of his decision to speak with the detective. The trial court did not err to the extent that it determined that the record showed that these factors did not weigh in favor of determining that Stratton's confession was involuntary. See *Cipriano*, 431 Mich at 334. Rather, the totality of these circumstances supports the conclusion that Stratton was aware of what he was doing and was voluntarily participating in the polygraph process for his own reasons.

In his motion for a new trial and on appeal, Stratton does not spend much effort contesting those factors. Instead, he argues that there was evidence that he had a limited intellect and so was vulnerable to the detective's use of various interrogation tactics. Specifically, he noted that he had hired an expert, Dr. Thomas Shazar, who opined that Stratton's limitations made it difficult for

Stratton to effectively apply the *Miranda* warnings within the context of his interrogation. He maintains that this deficiency alone warrants concluding that his confession was involuntary.

The trial court did not err when it determined that the proposed expert opinion did not alter the analysis. Dr. Shazar stated in his report that he had no basis to conclude that Stratton suffered from a chronic psychotic disorder or a chronic mood disorder. He tested Stratton and determined that he had an IQ of 92, which did not fall within the deficiency range, but was "appreciably below average." Dr. Shazar explained that Stratton was under the impression that, if he could pass the polygraph examination, he would be exonerated of the charge of forcible rape. Dr. Shazar felt that the detective reinforced that understanding. He also found it noteworthy that the detective repeatedly implied during the interrogation that AK's age when Stratton first began having sex with her did not matter. "It was in this context that," Dr. Shazar wrote, "although [Stratton] demonstrated an awareness that having sex with an underage partner is illegal, he nonetheless continued to make statements that he had done just that." Dr. Shazar concluded that, relative to a person with average intelligence, it was "far more difficult" for Stratton to recognize the contradictions between the warnings that his statements could be used against him and the detective's statements that AK's age at the time was not important. He stated that Stratton's limitations impaired his ability to make an informed decision whether to tell the detective that he had sex with AK before she was 16 years of age. He also did not appreciate the significance of the original date that he gave the detective for their first sexual encounter until more than an hour into the interrogation.

Dr. Shazar stated that, although Stratton's Full-Scale IQ was 92, he had a working memory index of 86 and a processing speed index of 89. Dr. Shazar stated that Stratton's information processing speed fell at the 23rd percentile. He also wrote that Stratton's capacity for attention and for holding information temporarily in his memory and manipulating the information was in the 19th percentile. Dr. Shazar opined that these scores significantly impaired Stratton's ability to make a knowing decision to answer individual questions that required the use of information processing.

Overall, Dr. Shazar's report established that Stratton had some intellectual limitations that affected his cognitive skills but that his functioning did not fall within the range of an intellectual deficiency. Dr. Shazar's opinion that Stratton might have had some difficulty reconciling the detective's use of interrogation tactics to induce Stratton to answer questions with the criminal implications of those statements did not necessitate the conclusion that Stratton's statements were coerced.

The Supreme Court has stated that a defendant's mental condition is an important factor to consider when determining whether a confession was voluntary, but it also stated that mental condition by itself was not sufficient to warrant disposing of the inquiry into whether the confession was voluntary. See *Colorado v Connelly*, 479 US 157, 164; 107 S Ct 515; 93 L Ed 2d 473 (1986). The Court explained that there must be some coercive police conduct before a confession can be deemed to be involuntary. *Id*. at 167. Moreover, it is well settled that the use of interrogation tactics to pressure a defendant to answer does not by itself demonstrate that a confession was involuntarily caused by police misconduct; instead, the evidence must show that the overall impact of the interrogation caused the defendant's will to be overborne. See *Garner v Mitchell*, 557 F3d 257, 264-265 (CA 6, 2009) (stating that it is well established that mental capacity

-14-

is but one factor and holding that diminished capacity alone does not prevent a defendant from validly waiving his or her rights).[2]

The trial court correctly determined that Dr. Shazar's report did not undermine the conclusion that Stratton freely and voluntarily spoke with the detective. As Dr. Shazar himself related about the video evidence, Stratton did not appear to be affected by mental disorders or under the influence during the interrogation:

> [Stratton's] speech in this recording is coherent, and free from patently delusional content. He is not preoccupied or otherwise behaving as though he is hallucinating. With respect to his social behavior, it is not peculiar. He is polite and cooperative, and at different times he engages in small talk with the detective. His emotional expressions are minimally variable and he does not appear to be euphoric, irritable, or particularly sad or anxious. He does not exhibit psychomotor acceleration or psychomotor retardation. As well, his speech is not slurred and he does not exhibit any other signs of apparent intoxication.

The video evidence confirmed that Stratton was lucid and coherent throughout the interrogation and that he considered his answers to individual questions. Dr. Shazar makes much of the fact that Stratton apparently was unable to appreciate the significance of stating that he had sex with a child under the age of 16 years of age, but the video evidence suggests the opposite. He told the detective that the first time he had had sexual intercourse with AK was before she went up north. Stratton acknowledged that he "messed around" with AK when she was not quite 16 years of age. He later rejected the contention that she must have been 10 years of age. He even agreed that that would not be "cool" if she was 12 years of age after he realized that his time line was off. He tried to convince the detective that she was 15.

The actual interchanges between Stratton and the detective suggest that Stratton was aware that it was illegal to have sexual intercourse with a child under the age of 16, but that he also knew that it was far worse to have had sex with a child under 13 years of age. The fact that Stratton tried to convince the detective that he only had sexual intercourse with AK when she was 15 years of age, rather than 12 years of age, demonstrated that he understood the ramifications of his statements and that he made them in an effort to minimize his conduct and explain why it was that he might not have passed the polygraph examination. The fact that Stratton's efforts to minimize his conduct backfired after it became clear that Stratton must have had sexual intercourse with AK before she was 15 years old did not demonstrate that Stratton's answers were involuntary.

Examining the video evidence as a whole, it is evident that Stratton voluntarily spoke with the detective in order to foreclose the investigation into AK's allegation that he forcibly raped her. As part of that effort, Stratton claimed that they had consensual sexual intercourse and that they had had a previous sexual attraction to each other. That admission, however, implicated the age of consent, and Stratton clearly understood that. He nevertheless persisted with that assertion until

---

[2] Although decisions from lower federal courts are not binding on this Court, they may be persuasive. See *People v Haynes*, 338 Mich App 392, 426 n 4; 980 NW2d 66 (2021).

he realized that his own statements suggested that AK was under 13 years of age, which was a far more serious offense. The fact that Stratton's decision to speak with the detective was ill-conceived and backfired against him did not render Stratton's confession involuntary.

Moreover, this case did not involve the kinds of police misconduct that have been held to have coerced confessions. There was no evidence that the detective subjected Stratton to conditions designed to fill him with terror and frightful misgivings, and which included lengthy efforts to break his will. Cf. *Chambers v Florida*, 309 US 227, 239-240; 60 S Ct 472; 84 L Ed 716 (1940). There was also no indication that the detective knew that Stratton was insane and incompetent at the time of the interview and exploited Stratton's mental condition. Cf. *Blackburn v Alabama*, 361 US 199, 207-208; 80 S Ct 274; 4 L Ed 2d 242 (1960). He was also not a trained psychiatrist who used subtle techniques and promises of leniency to overbear Stratton's will. Cf. *Leyra v Denno*, 347 US 556, 559-560; 74 S Ct 716, 718-719; 98 L Ed 948 (1954). Instead, he used simple rapport-building techniques, suggested context that minimized Stratton's culpability, and related that he was not interested in past crimes. Although the use of these techniques encouraged Stratton to continue making statements, the totality of the circumstances does not suggest that these techniques overbore Stratton's will. See *Garner*, 557 F3d at 264-265; *Astello*, 241 F3d at 967. Rather, the circumstances supported the trial court's determination that Stratton voluntarily spoke with the detective. See *Cipriano*, 431 Mich at 334. For that reason, the trial court did not err when it determined that Stratton's lawyer could not be faulted for failing to move to suppress Stratton's statements on the ground that the detective coerced his confession by using interrogation tactics on a person with below average intelligence. See *Riley*, 468 Mich at 142 (stating that defense counsel has no obligation to file meritless motions). Consequently, the trial court did not abuse its discretion when it denied Stratton's motion for a new trial premised on this claim of error.

## V. FALSE ALLEGATIONS OF SEXUAL ABUSE

### A. STANDARD OF REVIEW

Stratton next argues that his lawyer provided ineffective assistance by failing to use police reports to establish Stratton's right to impeach AK with previous false allegations of sexual abuse. This Court reviews de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *McFarlane*, 325 Mich App at 527.

### B. ANALYSIS

The right to confront witnesses guarantees that a defendant will have a "reasonable opportunity to test the truth of a witness' testimony." *People v Hackett*, 421 Mich 338, 347; 365 NW2d 120 (1984). Although evidence involving a witness's sexual conduct is generally inadmissible, a defendant may present evidence tending to show that the witness has made false accusations of rape in the past. *Id*. at 348. The defendant must make an offer of proof that demonstrates the relevance of the evidence for that purpose. *Id*. at 350. In the context of false allegations, the defendant must demonstrate both that the witness made an allegation of sexual abuse and that the allegation was false. See *Williams*, 191 Mich App at 273.

-16-

Although Grow filed a motion requesting permission to impeach AK with her previous allegations of sexual abuse, Grow failed to make a proper offer of proof and the trial court precluded Grow from impeaching AK using allegations that she may have made in the past. Stratton argued in his motion for a new trial that his lawyer provided ineffective assistance by failing to establish grounds for impeaching AK. In making this argument, Stratton relies on several reports by various investigators who looked into whether AK had been exposed to possible sexual abuse as proof that AK made false allegations in the past.

Stratton first relies on police reports involving investigations into whether AK was touched inappropriately in 2012. The author of the police report stated that AK's father reported that AK said that a former neighbor had touched her butt and leg and was always trying to give her things. The author also interviewed AK's teachers, and they expressed concern about AK's living arrangements given some statements that AK had made at school. The officer reported that one teacher said that AK told her that a mentally handicapped person touched her butt and that another adult male also touched her. One teacher related that AK said that a particular man always wanted her to sit on his lap. The teachers were also concerned that AK's father was not an appropriate caregiver and could not protect AK. A forensic interviewer interviewed AK and wrote a report. The interviewer stated that AK said that one man grabbed her arm, which made her father angry. AK denied that another man touched her private parts. She did state that one man touched her "bottom," but she described it as a slap. The author noted that it was difficult to state whether any of the persons that AK said touched her did so for a sexual purpose. Accordingly, the author stated that there was no basis for concluding that anyone engaged in sexual contact with AK.

Setting aside that the reports themselves involve multiple levels of hearsay, there was no information in the reports from 2012, which would permit a reasonable finder of fact to conclude that AK made a false allegation of sexual abuse. AK's statements were all related by third parties, and none of them indicated that AK described the touches as involving sexual abuse. AK described being slapped on the butt and grabbed, but she did not relate to anyone that she had been touched in a sexual way. There was also nothing in the reports to suggest that the allegations she actually made were false. Rather, the investigator merely determined that, because there was no evidence that the touches were for a sexual purpose, there was no reason to proceed with the investigation. The trial court correctly determined that this group of reports did not establish a basis for impeaching AK.

Stratton also relies on a police report from 2016 in which an officer investigated whether SB's boyfriend had touched SB inappropriately. The officer wrote that AK had called the police department because she was worried that SB's boyfriend "may have done inappropriate" things with SB. The officer interviewed SB, and SB denied that her former boyfriend had done anything inappropriate. The trial court determined that a claim by a witness that a third-party had been sexually abused would be irrelevant unless the witness knew that the claim was false or acted with reckless disregard for the truth. That was not error. The officer's report suggested that AK was concerned about SB's safety. Notably, the officer wrote that AK felt that there *may* have been inappropriate sexual contact between SB and her boyfriend, not that there actually was inappropriate sexual contact. Accordingly, the report does not establish that AK made a false allegation.

Stratton finally relied on police reports from a 2017 investigation in which an officer attempted to determine who might be the father of AK's baby. The author of the report wrote that AK identified two brothers who might be her baby's father. She apparently told the officer that she had consensual sex with one brother and that, on a different occasion, she drank alcohol with the other brother and they both woke up half naked next to each other. She was unsure whether she had had intercourse with the second brother and told the officer that, if they did, she did not consent to it. The officer wrote that the first brother admitted to having had consensual sex with AK. The second brother denied ever having sex with her. After the genetic testing established that neither brother fathered AK's child, the officer closed the case. This report also does not establish that AK made a false allegation of sexual abuse. Rather, it shows that AK had sexual intercourse with one brother, and he admitted as much. Therefore, that incident involved a verified incident of possible criminal sexual conduct. As for the second brother, AK did not state that she had sexual intercourse with him. She related that she woke up half naked and opined that, if they had had sex, it would not have been consensual. No reasonable finder of fact examining AK's statement could conclude that AK falsely accused the second brother of criminal sexual conduct.

The trial court correctly determined that the reports did not constitute evidence that warranted a hearing to determine whether there was evidence that could be used to impeach AK at trial for making false allegations of sexual abuse. See *Williams*, 191 Mich App at 273. Because the police reports did not establish grounds for impeaching AK, even if any of his lawyers had used them in a motion requesting permission to impeach AK on the basis of the statements that she purportedly made, the motion would have been meritless. See *id*. Stratton's lawyers cannot be faulted for failing to make a meritless motion for permission to impeach. See *Riley*, 468 Mich at 142.

## VI. CUMULATIVE ERROR

Stratton finally argues that, even if no one error warranted relief, the cumulative effect of the errors warrants a new trial. The cumulative error doctrine is part of a reviewing court's harmless-error analysis. See *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002). The doctrine recognizes that the cumulative effect of several minor errors may warrant a new trial even though no one error warranted a new trial on its own. See *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). In this case, Stratton has not identified any actual errors on appeal. Therefore, there is no prejudice to aggregate.

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Christopher M. Murray